My name is Tom Bolton. I am here on behalf of the Santa Rosa County Sheriff's Office in this jail suicide case. This case examines Monell liability as against the sheriff for the jail suicide at two distinct levels and at two different procedural postures. The first is whether or not under Rule 50A and then under Rule 50B there was sufficient evidence that a policy or custom of the sheriff was the cause of an underlying violation of the inmate's rights. The second question is whether or not there was a lack of causation within the deliberate indifference claims against the individual deputies Gaddis and Bowman such that there was no underlying constitutional violation to begin with. Starting with the letter, the law is clear that it's a two-step process. First, there has to be a constitutional violation by the agent or employee of the agency. And then second, there must be proof that there was an official policy or custom that something so widespread as to have the force of law that was the cause of the underlying constitutional violation. Here we had, there was an official policy, but the policy was not being followed. And then there was testimony that there was a custom that was in place that was different from the official policy. If you interpret, if you just isolated the words continuous observation and the written policy, that's not what was being done. Fifteen-minute checks were being done. They could, the testimony I think was universal that they could be done from the seated position at the control desk. They call it ACR 1. Looking at ACR 1, I'm sorry, the control desk. Looking at ACR 1, they could be done that way as long as you could see the inmate. But the flip side of that custom coin was that if you couldn't see the inmate, then you were obliged to stand up and go and look into the window to make sure that the inmate was okay. And I want to point out in the context of your question, it was plaintiffs who argued over and over and over again. I'm going to cite it to you, the closing argument. They were claiming that Gaddis and Bowman did not follow the custom. They argued, I'll give you the cite, it's on page 182 to 182 of day six of the transcript. This was in closing. They argued that neither Gaddis or Bowman did any checks for the last 45 minutes. Any checks of any kind. Seated, stand up, go look, however you want to characterize it. They did no checks. They argued to the judge at the time of arguing the 50A motion that the deputies did not follow the policy again, that they did no checks for the last 45 minutes from 10 a.m. to 1045. That's on page 143 of the day four transcript. But I thought between the relevant time was 930 to 1040, and I thought that during that relevant time period, Gaddis and Bowman testified that they did follow the jails and customs governing checks. But it doesn't begin the process of making the ligature and applying it to the PREA screen until late in that process. And they're supposed to do it every 15 minutes. Let's take just the 10 to 1045 as opposed to 940 to 1045. Either way, you're still absent three. Now, Gaddis at one point had testified, and Bowman testified that they did something like 12 checks in that last 45 minutes, but ended up having to agree that, no, they had not done those checks. Then there was the testimony, and this is being mocked throughout by plaintiffs, these claims by Gaddis and Bowman. One of them testified, I think it was Gaddis, that he did hearing checks, auditory checks, that he could hear the inmate and therefore did not believe that he needed to get up and go and look into the cell. And everybody agreed, including him, that there's no such thing under the custom that the jail had. So we start there. And I just think it's so important to recognize that it was plaintiff's case that they were not even following the custom. You add to that the lack of notice to the sheriff that that was going on at all, but on top of that, that there had never been a suicide using the suicide smock, right? Yeah, but do you have to – I don't know that you have to have – and maybe, I guess, address this. Why would the only way to prove that a customer policy is unconstitutional be to show that it's had problems before, right? So, I mean, if I adopt a customer policy that's just obviously problematic, it doesn't matter, right? You're right. Under the law, it doesn't have to be that, a series of prior events. But that is typically the way that it is done. And actually, the case file from the U.S. Supreme Court says that's ordinarily what's going to be required. Yeah, it sure is, yeah. Otherwise, it's got to be a known or obvious consequence. So you think about this from the perspective, let's assume that everything is known in terms of this 15-minute checks from the ACR desk. Is it a known or obvious consequence that an inmate is going to take a suicide prevention smock and make it a new statute? Well, wasn't there some evidence that that was specifically known and that there was some kind of protocol in place to cut the smocks? And normally you also give them a papercloth one as opposed to – it sounded to me like this was not a papercloth one. No, I think they transitioned to papercloths after this happened. There was discussion that that was an option. But I think that the testimony that you're talking about, Your Honor, was from I think it was Captain Stearns who testified that sometimes they could become frayed and the company that it was, I want to say Aramark, that they were sending them out to would take those out of circulation. And she said actually the thing that would become a problem would be the Velcro strap. And if the Velcro strap decided to deteriorate, they would pull it out. But there was no testimony that anybody had considered the possibility that a suicide prevention smock would be turned into a noose. Wasn't there also testimony about the fact that he was placed in the cell that had – I guess was it a bar? Yeah, that was put into place. It was one of the first jails to come into compliance with the Prison Rape Elimination Act. And this bar is placed so that there can be a privacy screen for that purpose. But again, you're having to combine all of these things and ask the question, okay, we have a PREA bar in here, which we're supposed to have. He's using a suicide prevention smock. But there were other cells that didn't have the bar. It might increase the odds of it if you have the bar. But can you say that it's a known or obvious consequence that an inmate will take a suicide prevention smock and use the PREA bar to commit suicide when that had never happened before? And, you know, it's just this confluence of circumstances that allow this to occur. And the question is, is it known or obvious? And it's a very high standard. I want to emphasize that as well from the United States Supreme Court case law and this circuit's case law. It's a very high standard to prove Monell liability. And I want to also address the issue of the jury's finding that there was, that any deliberate indifference by Gaddis and Bowman did not cause the death of Escada-Reyes. Yeah. Doesn't Barnett resolve that issue adversely to you? Your Honor, respectfully, I do not believe so. And first of all, I was defense counsel on Barnett. I see that you are often defense counsel in the 11th Circuit, so I'm not surprised. The point of Barnett was they were following a practice universally across the entire jail that they believed was consistent with state statute. Right? That is different than a situation like this where you've got a custom evolving from a written policy and it's not uniform. Right? And the judge, by the way, there was discussion of that. Oh, right. Yeah, yeah. I mean, the judge specifically said, hey, this is not that kind of case. This is a case. So I guess one odd thing about this to me is, is this an abuse of discretion issue that we review for abuse of discretion because it goes to how the verdict form is crafted? How do we look at this? On the second issue, I believe it was a Rule 59e motion that was based upon, and that had to be made post-verdict. Right. Because it only arises from the fact that the jury found no causation. So I believe that's an abuse of discretion standard, but I think that the Rule 50a and 50b would be de novo. But I guess it arises out of the fact that the verdict form tells them, and correct me if I'm wrong, but it arises out of the fact that the verdict form doesn't tell them, if you don't answer this question, stop here. Right? I mean, usually the verdict form says don't move on to address the claim against the sheriff if you don't find causation as to these two. The verdict form here said go on and move to the sheriff. Right? So isn't this baked into the verdict form? Well, but that doesn't remove the legal issue. Your Honor is correct. The problem was questions one and two were liability. Questions three and six, one for each deputy, was the causation question. And there was a lot of debate about, and the defense pressed repeatedly, they've got to answer yes to causation because causation is an element of the constitutional violation against the deputies. And the district court didn't do that. But the fact that the jury answered no to that question, no causation, means by definition there cannot be no liability because as a matter of law, there's no underlying constitutional violation. Yeah, but that's so strange because the first question that they answered yes to was is there a constitutional violation. Right? I mean, I tend to agree with you that I think causation is baked into the idea of a constitutional violation. I can't just like violate your constitutional rights and cause you no injury. Right? Just like in the abstract. But here, though, it's split out. Is there a constitutional violation? Causation of injury. And so what about the answer to that first question? Well, the three questions that are asked as to each deputy were appropriate. I mean, were they aware of a risk of suicide? Were they deliberately indifferent? And did it cause the constitutional injury? Those are the elements. I'm sorry. Didn't they find isn't really what they found is that there was a constitutional violation, but that the deputies or the guards were not the motivating, I think the language used is the motivating factor or the motivating cause. Right? And so that the motivating cause is the custom that the sheriff has in place that he's allowing to be used as opposed to the official policy. I thought of that. But here's the problem. If you adopt that reasoning, then you take out all of the elements. They no longer have to prove all the elements of the underlying constitutional violation. You're doing an end around and skipping over all of the questions for an underlying constitutional violation and skipping right to Monette. That might be appropriate in a case like Barnett. No doubt the sheriff knows that they're holding DUI detainees who blow triple zeroes. They think they're following a state statute. That might be appropriate in that context. But here, where it's specifically tied to the acts of two deputies, the plaintiffs agree that's their case, and they don't establish causation, therefore don't establish an underlying constitutional violation, there can be no Monette liability. And maybe I'm confused. And I'll let you have all your time for rebuttal. But I thought you did object to that jury instruction. Are you talking about the not including? It wasn't the jury instruction. It was the verdict form. The jury instruction properly instructed. But the verdict form, you know, it's the usual language of if you answered one, two, three, it should have said you must answer one, two, and three, or four, five, and six, yes, to move on to Monette liability. And it said only you have to answer one and two or four and five, yes. Right. And so I guess here's the do you want a new trial? No. Okay. So that's the issue there is that usually when there's a verdict form problem or a jury instruction problem, I don't say usually, all the time when there's a jury, you get a new trial. And so we don't know how the jury would have answered that question, I think. Maybe we do, but I'm not sure. If they had been instructed the way you want them to be instructed, right? I understand. That would – the problem with that reasoning, respectfully, Your Honor, I think is they did answer the questions, three and six. But don't you have to object before the jury is dismissed? And I think Judge Brasher is correct. You have to – one of the options is a new trial. And if you don't want a new trial, then what do you want? We don't need one because the jury answered questions three and six. No. Right, but you didn't object. And if you had objected before the jury was dismissed, there could have been argument with the other side and with the district court judge, and you could have made a determination as to whether or not there was an issue. Well, there was plenty of argument at the charge conference, a lot of argument, about whether questions three and six would have to be answered in the affirmative to get to Mon-El. There's quite a bit of argument about that. But if there's – if you're claiming an inconsistent verdict, then do you not have an obligation to object before the jury is dismissed? Yes, if you want a new trial, but the point is we're accepting the answers to questions three and six. No causation. If there's no causation, there's no underlying constitutional violation and therefore no Mon-El liability. That's a separate argument, by the way, than the 59 ER. Your Honor, I'm way over time. Thank you very much. It's an interesting argument. Thank you. Eric Sharp on behalf of Jessica Rogers. A lot of what you just heard would make an interesting argument if it were being made to a jury, but that's not what's happening here. You're reviewing for sufficiency of the evidence. And even before getting into what I was going to talk about, I have to correct something. The alerted opposing counsel said there was no testimony concerning the possibility of using the smock for suicide. That's just completely false. There's testimony from our expert, James Upchurch, a man with 40 years of experience in the corrections industry, ending his career as second-in-command of Florida's prison system. And he said, point blank, this smock was ridiculous. It was so frayed and worn down it could have been fashioned into a noose.  They could evaluate for themselves the extent to which this smock was noose-worthy. But all of that pales in comparison to the sheriff's own witness, Lieutenant Shane Tucker, who at the end of the trial, not having heard the rest of the testimony, in which the sheriff repeated that same party line all the time, oh, gosh, we thought the suicide smocks were completely foolproof. What happens? Lieutenant Sharp, Lieutenant Tucker comes in, testifies to how they kept a, quote, cut-down tool, and that's what you were getting at, Judge Brasher. It wasn't just the procedure, it was the tool. They kept a thing called a cut-down tool in ACR, around ACR, one at the control desk, and it was specifically to be able to cut people down hanging in suicide smocks. So the idea that there isn't evidence on this point about whether the smocks were. . . And I thought there was evidence that you were not supposed to put someone who was on suicide watch in that cell that had the bar. It's more general than that, even though, Your Honor, it's in a cell in which somebody could hang a ligature. And the smoke screen about how well Priya told us we had to put in the bar, the thing, that's true. You're supposed to have a shield there, but it doesn't have to be the kind of shield that has that L-shaped notch in which you can hang a ligature from. I thought also there was testimony that in that particular cell, it made it very difficult for the officers and guards to be able to monitor from the monitor. There was, I guess, a blind spot. It's not so much a blind spot, Your Honor, as an oblique angle. It would be as if I were charged with monitoring something happening over there, and it was trying to look through a window at an angle. And the angles from the control panel desk to the cell window are so oblique as to make it very difficult to see what's going on, especially once one is seated. And then on top of all this, two-thirds of the windows are covered. None of those were decisions made by deputies Baumann and Gaddis. These are all sheriff policies. That's why the jury faced such a difficult decision. You've got guards who at other times during the morning are doing things that are clearly wrong. They're falsifying the forms. But at the critical time, and here's another fact I need to correct here, Learned Opposing Counsel suggested that the noose was only available or tied late in that hour-long period. Completely incorrect. If you view the video, it's there from almost the start of the 9-30 period. It's openly displayed with this noose hanging in the back of the cell for fully an hour between 9-30 and 10-30. And it's going to erase. It's pacing back and forth in the cell frantically, continually sticking his head in the noose, trying to hang himself, giving up, getting more and more frustrated. And this cycle repeats itself over and over throughout that hour, and it's only the last few minutes of it around 10-30 when he succeeds in killing himself. But again, on the Rule 50 issue, you've got two parts of it, this causation argument. The first point to realize about that is that's waived. It was not made in the 50A stage at all. Which causation argument are you talking about when you say waived? The argument that the sheriff's policies didn't cause the death because it was really the deputies. And it's not just happenstance that that's waived. This is part of the sheriff's strategy because during the entire trial and at the point the Rule 50A would have been made, the sheriff and the deputies were one big tent, all one big happy family. And nobody was blaming one another. Certainly the sheriff wasn't saying, well, they departed from our policies. They were saying, yes, they did things right. And the deputies were saying, yes, the policies were fine too. But I want to go on to this because I get into some of the evidence here. Because, again, you're reviewing for sufficiency of the evidence, not whether this argument might have worked to a jury. On the point about causation, again, it's waived. But even if you get to this issue factually, the issue is, is there sufficient evidence to establish that the deputies or, sorry, that the jail's policies caused this problem? Now, during the critical time period, 930 to 1030, the deputies each testified that they made the checks. Gaddis says, I made the checks. I fill out the form. And then their testimony is ratified by the jail itself. In the case of Gaddis, it's ratified by Lieutenant Tucker, who did the internal affairs report. He comes out and says, yes, Gaddis did these checks. And, of course, you can see them on the video doing the checks as well. But then, even more critically, Deputy Baumann testifies, yes, I did checks as well. And that, her testimony, is also ratified in that case by Captain Barbara Stearns, the designated representative of the sheriff at trial. She says, yes, did those checks. And seated checks like that are acceptable. So, the idea that there isn't testimony establishing that during the critical time period, 930 to 1030, the deputies were following the custom is completely incorrect. And so much of what the sheriff is invested in is not showing the absence of evidence, but rather trying to tout positive evidence that the sheriff might have been able to argue to the jury during the jury trial to carry his case. But it doesn't establish the lack of evidence or our inability to establish evidence such that a Rule 50 motion could or should have been granted. The other part of it is this concept of adopted with deliberate indifference. I don't even really know what that means. But whatever else I'm sure of, that is not an element of Monell liability. If you look at even the sheriff's brief at page 39, it sets forth the elements. They were set forth in the jury instructions and the verdict form. They don't include adopted with deliberate indifference. Could you address the – I just don't want you to run out of time before you address the issue about the jury's findings of no causation on the part of the deputies. So could you address that? Certainly, Your Honor. And it is important to try to keep these separate, the Rule 50 and the 59. And what you're talking about here is the Rule 59 amending the judgment. And the problem – there are a myriad of different problems with the Rule 59 argument. If what you're getting at is you want me to address specifically the substance of whether there is a problem with the Barnett decision. Well, yeah. So, I mean, I guess – I don't know. This is being raised in a very cleverly lawyered way. So it doesn't fit neatly into any particular box. But the point I see the sheriff making is throughout the case, the sheriff argued that there needed to be a finding of causation on the part of the deputies in order to hold the sheriff liable. There was no finding on the part of the – causation on the part of the deputies. So the sheriff should not be liable. Therefore, don't enter judgment against the sheriff. Why isn't that – you kind of forget how it's being raised as a procedural matter. Why doesn't that logically make sense? Why isn't that correct logically? Because all that's necessary is a constitutional violation, not the completed tort. And the only reason the sheriff is even able to make this argument in the appellate briefs is by borrowing language from individual 1983 cases that talk about, well, to get 1983 liability for an individual, you need causation. No one's questioning that. You also need causation for Monell liability, but it's a different form of causation. And the jury verdict form and the jury instructions are specific on this. The jury needed to find that the policies were the moving force behind the death of Escano Reyes, which they did. Now, I want to go back to what you just – How is that – how is that finding consistent with the finding that the deputies didn't cause the death, right? I mean, if you say the deputies' negligence or whatever you might want to say, if their constitutional violation didn't cause the death, how is it – how did the moving – how did the policy cause the death in this particular circumstance? In this particular circumstance, you have the deputies acting, but you also have the policy acting on the situation. The deputies didn't select ACR 1 to put Escano Reyes in with the oblique sight lines and the covered windows and the ready-made place to hang the smock. And they didn't give him the smock either. That was the policy of the sheriff. Exactly right, Your Honor. That's exactly right. I mean, the sheriff could have had a policy to do what other prisons did, which is they have the paper smocks. And they stationed some – oftentimes stationed somebody directly outside a window looking right in the cell so they can observe the entire cell continuously too. But that's another matter. But, yes, you're right. The point is there's a set of policies. These policies acted on the situation. And what the jury had to do was determine whether what the deputies did is the cause or whether the moving force was the policies. And all that would remain now is whether there's sufficient evidence to establish that those policies were the cause, which that's a little bit – Because my understanding is that the guards in question, Gaddis and Bauman, I mean, they just happened to – There was a shift change and it happened there. But he was already in the holding cell when they got there. That's exactly right, Your Honor. And they had nothing to do with that. Now, they could have gone above and beyond the call of duty. They could have said, you know, these policies are crazy. We've got a psychotic person sitting a few feet away from us. Maybe we ought to go and approach the window, open up the shades and see what's actually going on in that cell. They could have done that. They didn't. But the notion that there's any inconsistency between what we were arguing now or then, it's completely false. We've argued all along that, yes, the deputies did some things wrong and the jail had customs and practices that were grossly wrong. And we've argued that both of them could have caused this situation. The jury did. The sheriff. And there's ample evidence to support the jury's determination that it was the sheriff's policies that were the moving force. Getting back to the question about Barnett and inconsistency, you suggested that the sheriff argued all along that there had to have been probation or a full, completed constitutional tort. That is not correct. If you look at their jury instructions, they divide out the concept of constitutional violation from the completed tort. In both the jury instructions, which the sheriff now concedes are correct, and in the verdict form. The only place where this argument is ever put in play is orally. The sheriff tries to cut back against what's in the instructions and what's in the verdict form and say, yes, but we'd like you to insert language between the two counts saying, don't reach this count. If you haven't reached the earlier count. And that wasn't done as a matter of law. That was done as a matter of prudential or policy. And all the sheriff did at that point was invoke the potential for an inconsistent verdict or for Monell for vicarious liability. And this gets to the invited error point that we made. Their own jury instructions embed this concept that you can violate the Constitution without causing the death. And, of course, that's fully consistent with this circuit's law and that in every other circuit. For example, you can have a constitutional violation and get nominal damages if it didn't cause death, destruction, property or otherwise. So the notion that 1983 of the Monell liability requires a full individual deputy liability is completely false and point blank barred by the decision in Barnett. That's and Barnett, by the way, has been adopted by six other circuits. No other circuit has ever decided anything remotely contrary to Barnett. In fact, there isn't even a district court case cutting back against this saying, well, we really think these verdicts are inconsistent. So we're going to let a Monell defendant off because the deputies or because the underlying individuals were let off. Sheriff can't even give you an example of this having been done. But I want to get back to the Rule 59 because the context in which it's raised is critical not just for, it's critical for three different waivers. The failure to do it while the jury's impaneled. And there was some suggestion that, well, maybe if we wanted a different form of relief or something like that, that that might excuse that. No way. Reader v. Philip Morris is point blank clear. If you're claiming inconsistency, you need to do it during impanelment. The first step is to tell the judge we think it's inconsistent. Judge ruminate about this and to try to figure out whether it is actually inconsistent. If it is, the judge puts it back to the jury on the horns of dilemma saying, well, you can do this or this, but not what you've done. That wasn't done here. The next point is that the invited error point. I think I've covered that enough. And I want to get to the remedy. The district court can't abuse its discretion because the remedy here, assuming that the claim is that there's somehow a defective verdict form, the organic remedy for that is a new trial. Sheriff just reaffirmed that they're not seeking it, but they also told this to the district court in writing. You cannot opt for a new trial. They don't want a new trial because they didn't want to expose themselves to further damages or even punitive damages. So the idea that there could be an abuse of discretion for Rule 59, which is an extraordinary remedy requiring a manifest error of law or fact, and that you now review for abuse of discretion and it's never been used in this context even remotely, is frankly ridiculous because the district court alone could have denied this motion on the fact that you disavowed the one remedy that the circuit would endorse for a situation where you're claiming there's a defective verdict form. That's the good game case in 1995 that says that. But it's also just common sense. You don't give someone a complete free pass just because there's some defect at some smaller point during the trial. But the other point here is this point about objecting while the jury's impaneled and the improper remedy, these were in our response brief. They were a separately captioned argument, big, bold headings, improper objection, not while the jury's impaneled, and improper election of remedies, and they bar relief. And if you look at the sheriff's reply brief, there is no mention of either point. They're effectively defaulted or conceded. And either one of those two points is sufficient to bar Rule 59 relief, especially when you consider that it's an extraordinary remedy reviewed for abuse of discretion that required a manifest error of law. And you had an example yesterday with the argument, and I apologize, Judge Booley, but your argument yesterday about the Tila case in which Judge Karn said, you know, you've got a judgment here that's with prejudice, but really it was decided on a basis of standing. You should go back and modify that judgment to reflect that it's not outstanding. That's what you use Rule 59 for. You don't use it to recycle a whole claim that there was some kind of error throughout the entire proceedings, so just delete us from the judgment. That has literally never been done in this circuit or any other circuit. Now, I don't have a case saying you can't do it. What I proved is you can't do it by negative implication because I listed all the other kinds of cases, similar to what Judge Karns was getting at yesterday, of making a minor tweak to a judgment. That's how it's used, not this way. Whatever else I know, there could be no possible abuse of discretion here. Sorry, I'm going over time here, so if there are no other questions, I will stand down. Thank you very much for your argument. Mr. Colton. Your Honor, I'd like to begin by putting some context to this issue of, was the sheriff obliged to ask for a new trial at the time that the jury came back? The sheriff, before the jury form was submitted to the jury, said you've got to have in there, they've got to answer questions three and six yes in order to get to Monell liability. I don't think he's saying that you need to ask for a new trial, but the remedy for the Rule 59 is that that is the remedy, a new trial. That is one remedy, but if the court can also amend the judgment, if the verdict form that was submitted to the jury, the jury answers no on causation as to Gaddis and Bowman, and I want to point out. It's a little complicated to do when you didn't make an objection before the jury was dismissed because the whole point of objections, as everyone knows here, is that it gives the district court judge an opportunity to correct any potential errors, and it gives both sides the ability to argue. The defense had argued repeatedly that three and six had to be answered. The judge said no. The jury comes back with a verdict, and they say no causation. Why can't the sheriff embrace that at that point in time? If the jury has said there's no underlying constitutional violation and there's no Monell liability, why can't the sheriff embrace that finding? You can embrace it. I guess it's a strategic decision, and it may pan out or it may not. I understand. In that vein, I'd like to point out that it was the plaintiff who proposed the jury instruction. This is dated 9-16-21, that the jury can find the sheriff liable only if they found an underlying constitutional violation by the deputies. That was the plaintiff's proposed jury instruction. I'd like to address the timing issue. Counsel says that I'm misstating the timing. I am quoting from their closing argument. They said there were no checks for the last 45 minutes. That was their closing argument to the jury, to the judge the day before the charge conference, or in response to the directed verdict motion or the judgment as a matter of law motion. They said the deputies did nothing for 45 minutes, the last 45 minutes. That was their position during the trial. If no checks are being done, which is contrary to the custom, then how can it be the sheriff's fault that they allowed Mr. Escanor-Reyes to commit suicide? I want to talk about the issue of the suicide smock. Counsel pointed out that there was testimony from their expert that the suicide smock could be used to commit suicide. This is the only time that it's ever happened. That's the only time in the record. I want to point out the question is not whether it is theoretically possible. The question is whether it is a known or obvious consequence. That's the Monell standard. I kind of want to end on that point, unless your honors have any questions, which is that there was a negligence verdict here, and it's been paid. Negligence judgment, and it's been paid. The question is Monell liability, which is a much higher standard. It's much more specific. It's not nearly as negligent as the deputies, and it's been paid. The only issue here is 1983 liability as to the sheriff, and because of the fact the jury found no. It's an element of the tort. It's a completion of the tort. It's an element of the tort of deliberate indifference causation. It's not just a tag along, okay, and the jury said there's no causation. Case is over. Thank you. Thank you. Thank you. Thank you all. Have a good day. Now, Mr. Poulton, now you're free to go. All rise. Thank you.